# WABASH RAILROAD COMPANY *v.* PEARCE.

ERROR TO THE ST. LOUIS COURT OF APPEALS OF THE STATE OF MISSOURI.

No. 112. Submitted December 18, 1903.—Decided January 11, 1904.

Where not only the scope and applicability of the doctrine of subrogation is involved, but also the extent to which a common carrier is protected by the laws of the United States in paying customs duties exacted thereunder on goods in transit over its lines, a Federal question is presented, which, when properly set up in the state courts, is subject to review by this court.

A common carrier has, under the laws of the United States, a lien entitling it to possession until paid, on goods in transit over its lines for legal im-

port duties paid thereon by it either directly to the Government or to a connecting carrier which has already paid the same.

Where a contract of shipment, from a point without to a point within the United States over the lines of several carriers, provides that each carrier shall be liable only for loss or damage accruing on its own lines the last carrier is not responsible for damages resulting from an examination by customs officers at a point not on its own line, and different from the point to which the contract provided that the goods should be delivered in bond.

On June 25, 1895, Charles E. Pearce, the testator of the defendants in error, commenced his action in replevin in the Circuit Court of the city of St. Louis, Missouri, to recover from the railroad company four boxes of curios. After answer a trial was had before the court without a jury, resulting in a judgment for the plaintiff, which, on May 7, 1901, was affirmed by the St. Louis Court of Appeals. 89 Mo. App. 437. An application to transfer the case to the Supreme Court of the State on the ground that it involved the validity of a statute of or authority exercised under the United States was denied, *State ex rel.* v. *Bland*, 168 Missouri, 1, and thereupon it was brought here on writ of error.

The facts are undisputed, and are as follows: Pearce was the owner of the curios, and in Yokohama, Japan, shipped them to St. Louis. The bill of lading was issued by the Canadian Pacific Railway Company, and recited that the goods were shipped upon the company's steamer, Empress of India, to be carried to Vancouver, British Columbia, and thence over the Canadian Pacific and connecting lines to St. Louis, Missouri. The boxes were carried to Vancouver and thence by the Canadian Pacific Railway Company over its own and a connecting line controlled by it to St. Paul, Minnesota. Upon arrival at St. Paul the custom officers took possession of the boxes, opened and examined the contents, and duly assessed the duties thereon at $264.31, which sum was paid by the railway company and had to be paid in order to regain possession and forward the goods. The goods were thereafter delivered to the Chicago, Milwaukee and St. Paul Railway Company, by

it to the defendant at Given, Iowa, and by the latter carried to St. Louis. The inspection at St. Paul was in strict accordance with the laws of the United States and the duties exacted were properly chargeable upon the goods. When the defendant received the goods from the Chicago, Milwaukee and St. Paul Railway Company it became responsible under its traffic agreements for the payment of the charges then on the goods, including the custom duties, and has since paid those charges. On receipt of the goods in St. Louis they were tendered to the plaintiff upon payment of the charges. The goods were shipped in bond to St. Louis and this was so marked on the boxes. If they had been transported to St. Louis in bond, as they should have been, they would there have been opened and examined and retained in the custody and possession of the custom officers, not only during examination and inspection, but also until the duties were paid.

*Mr. Wells H. Blodgett* and *Mr. George S. Grover* for plaintiff in error:

The answer tendered a defence based upon an authority exercised under a statute of the United States. This confers jurisdiction upon this court to hear and determine this controversy. Section 709, Revised Statutes of the United States; U. S. Compiled Statutes, 1901, vol. 1, p. 575.

The government of the United States had, until the payment was made to it, a prior and paramount lien on the goods for the duty which Major Pearce has refused to pay. Overton on Liens. § 656, p. 709, and cases cited; *Hodges* v. *Harris*, 6 Pick. (Mass.) 360; §§ 3095 *et seq.*, Rev. Stat. U. S. 1878, pp. 594 *et seq.;* §§ 3058 *et seq.* Compiled Stat. U.S. 1901, vol. 2, pp. 2004 *et seq.*

The plaintiff in error has, also, a valid lien on the goods in question for the charges advanced by it to its connecting line, in the usual course of business. Ray on Freight Carriers, § 102, p. 407, and cases cited; Hutchinson on Carriers (2d ed.), § 478a, p. 541, and cases cited; Schouler on Bailments, p. 544, and

cases cited; *Wells* v. *Thomas*, 27 Missouri, 17; *Moore* v. *Henry*, 18 Mo. App. 41; *Armstrong* v. *Railway*, 62 Mo. App. 642; *Gerber* v. *Railway*, 63 Mo. App. 145.

The case here relied on by the defendants in error, *Mellier* v. *St. L. & N. O. Line,* 14 Mo. App. 281, is not in point, because there was no agreement here to transport the goods in question in bond; nor were they, as in the *Mellier case, supra,* lost in transit by reason of an attempted misdelivery to an irresponsible connecting carrier, who refused to receive them.

Under the contract of shipment in evidence, the plaintiff in error is not responsible for the injury and loss here claimed, as it is conceded that such injury and loss occurred beyond its own line. *Goldsmith* v. *R. R.*, 12 Mo. App. 479; *Orr* v. *R. R.*, 21 Mo. App. 333; *Myrick* v. *R. R.*, 107 U. S. 102; *Coates* v. *Express Co.*, 45 Missouri, 238; *Snider* v. *Express Co.*, 63 Missouri, 376; *Dimmitt* v. *R. R.*, 103 Missouri, 433; *Nines* v. *R. R.*, 107 Missouri, 475; *McCann* v. *Eddy*, 133 Missouri, 59.

The defendants in error cannot recover in this action, because the refusal of the plaintiff in error to deliver the goods until the charges were paid was a proper, and not a wrongful, act, and plaintiff in error has a perfect defence to this action under § 3100, U. S. Rev. Stat., with the subsequent amendments thereto. See authorities cited, *supra.*

*Mr. Edward C. Kehr* for defendants in error:

There is no Federal question in the case and the writ of error should be dismissed. The question was adjudicated between the parties by the Supreme Court of Missouri. *State* v. *Bland,* 168 Missouri, 1.

The Supreme Court of the United States is bound by the decision of the state court in regard to the meaning of the constitution and laws of its own State, and its decision upon such a state of facts raises no Federal question. *Turner* v. *Wilkes County*, 173 U. S. 461, 463; *Central Land Co.* v. *Laidley*, 159 U. S. 103.

The supposed subrogation by virtue of which the Wabash

Railroad Company claims to withhold the plaintiff's property, does not arise under any statute of or authority exercised under the United States. U. S. Rev. Stat. § 709.

To give the Supreme Court of the United States jurisdiction over the judgment of a state court, it must appear that the decision of a Federal question presented to that court was necessary to the determination of the cause, and that it was actually decided, or that without deciding it, the judgment rendered could not have been given. *Brown* v. *Atwell's Admr.*, 92 U. S. 327; *Citizens' Bank* v. *Board of Liquidation*, 98 U. S. 140; *DeSaussure* v. *Gaillard*, 127 U. S. 234; *Blount* v. *Walker*, 134 U. S. 607, 614; *Jersey City & B. R. R.* v. *Morgan*, 160 U. S. 288; *Sawyer* v. *Piper*, 189 U. S. 154.

Where the Supreme Court of a State decides a Federal question in rendering a judgment and also decides against the plaintiff in error on an independent ground not involving a Federal question and broad enough to maintain the judgment, the writ of error will be dismissed. *Hale* v. *Akers*, 132 U. S. 554, 564; *Murdock* v. *Memphis*, 87 U. S. 590, 634; *McManus* v. *Sullivan*, 91 U. S. 578; *Capital Bank* v. *Cadiz Bank*, 172 U. S. 425, 430.

St. Louis being a port of entry and delivery, the plaintiff was entitled under the laws of the United States to have his goods shipped and brought to St. Louis in bond, and at St. Louis to make his entry for the purposes of customs payment. The goods having been delivered to and received by the Canadian Pacific Railway, for transportation in bond to St. Louis, it became the duty of the carrier to transport the goods in bond to St. Louis, and, if so transported, they were not subject to examination and customs assessment at any point other than St. Louis. U. S. Rev. Stat. §§ 2994, 3102.

The carrier had no right to change the contract destination of the goods, nor to change their consignment from Schade & Co., St. Louis, to F. Jones, St. Paul, nor to do otherwise than to carry them in bond to St. Louis. *Mellier* v. *St. Louis & N. O. T. Co.*, 14 Mo. App. 281, 292.

The freight was prepaid to St. Louis. The carrier therefore has no freight lien on the goods. The money advanced in payment of the duties is no part of the cost of transportation and the carrier acquired no lien on the goods by paying them. *Steamboat Va.* v. *Kraft,* 25 Missouri, 76, 80; Hutchinson on Carriers (2d ed.), § 478.

The railroad company was not subrogated to the government's lien for the import duties. *Ætna Ins. Co.* v. *Middleport,* 124 U. S. 534, 547; *Hinchman* v. *Morris,* 29 W. Va. 673; *Griffing* v. *Pintard,* 25 Mississippi, 173; *Wallace's Estate,* 59 Pa. St. 401; *Mercantile Trust Co.* v. *Hart,* 76 Fed. Rep. 673; *Milwaukee & M. R. Co.* v. *Soutter,* 80 U. S. 517; *German Bank* v. *United States,* 148 U. S. 573, 580; *Wilkinson* v. *Babbitt,* 4 Dill. 207; Sheldon on Subrogation, § 241, p. 361.

Taxes are not debts. A tax is an impost levied by authority of government upon its citizens for the support of the State. *Carondelet* v. *Picot,* 38 Missouri, 125; *Blevins* v. *Smith,* 104 Missouri, 595; *State ex rel.* v. *Snyder,* 139 Missouri, 553.

Mr. Justice Brewer, after making the foregoing statement, delivered the opinion of the court.

Two questions are presented—one of jurisdiction and the other on the merits.

With regard to the first, the decision of the Supreme Court of the State is not controlling. It is not the province of a state court to determine our jurisdiction; and further, the Missouri statute, providing for a review of certain cases by the Supreme Court, is not identical with but more limited than section 709, Rev. Stat., which prescribes our jurisdiction over final judgments of state courts.

It is contended that the only question determined by the state court was the applicability of the equitable doctrine of subrogation, that no statute of Congress was suggested giving a right of subrogation in cases like this, and therefore that the decision of the state court rested upon a matter of general law. But the answer of the defendant, after stating the circum-

stances of the payment by the several carriers, alleged that it was "entitled to the first lien on said goods under the laws of the United States for the amount of said duties." Although no single statute was mentioned, it claimed a lien on the goods under and by virtue of the laws of the United States, and thus directly called for a determination of a Federal right. *Crowell* v. *Randell*, 10 Pet. 368; *Bridge Proprietors* v. *Hoboken Co.*, 1 Wall. 116, 142; *Furman* v. *Nichol*, 8 Wall. 44, 56; *Dooley* v. *Smith*, 13 Wall. 604. The question in fact presented and decided was not simply the scope and applicability of the doctrine of subrogation, but rather to what extent, considering the obligations cast by the revenue laws and the duties of common carriers as between themselves and the shipper, the carrier was protected by the laws of the United States in paying custom duties exacted under them. When we stop to consider the great volume of imports handled almost exclusively by common carriers, the owners or consignees being often in the interior of the country, this is obviously a question of supreme importance. And this question is solved not alone upon general principles of law, but involves an enquiry as to the effect of exactions made under authority of the statutes of the United States. We are, by section 709, Rev. Stat., given jurisdiction over the final judgments of state courts "where any title, right, privilege, or immunity is claimed under the Constitution, or any treaty or statute of, or commission held or authority exercised under, the United States, and the decision is against the title, right, privilege, or immunity specially set up or claimed." The contention of the railroad company is that payment of duties exacted under the statutes of the United States does not operate simply to release the goods, but also gives in cases like the present, to the carrier, the right and privilege of maintaining possession until it is reimbursed these duties. Is the statute to be considered simply as a demand for money, or does it also carry a grant to one situated as this carrier, of a right and privilege of possession? This right and privilege was specially set up and

claimed by the railroad company. Whether it existed was the substantial question presented and decided. And whether rightly or wrongly decided the presentation of the question, the claim of the right and privilege was, when denied by the state court, sufficient to give this court jurisdiction.

We pass, therefore, to consider the merits. Do the laws of the United States exacting the payment of duties at ports of entry justify the carrier in paying those duties, and give to it a lien therefor as against the owner? It must be remembered that the Government has not prescribed payment simply at the place of delivery, but has named the ports of entry at which, and at which only, payment can be made. Must the carrier insist that the owner shall be present at the place of entry to himself make payment, or, after notifying the owner, leave the goods in the hands of the Government officials to be held for the charges thereon, or, may the carrier pay the charges and maintain possession until reimbursed by the owner? It is unnecessary to consider what rights would exist if it were alleged that the goods imported were free from duty, or that there had been overcharges or wrongful conduct on the part of the Government officials. Here the regularity of the proceedings on the part of the Government officials and the correct amount of the duties collected are unquestioned.

We are of opinion that the custom laws of the United States are potent to fully protect the carrier in the payment of the legal duties charged upon goods in its possession. In order to fully understand the force and scope of any statute or body of statutes we must have regard to the conditions and circumstances for which the legislation was intended and under which it is to become operative. We are not narrowly to read the letter and ignore the state of affairs to which that legislation was intended and is applicable. As we have said, the great body of imports is subject to duties, and payment thereof is by statute specifically required to be made at certain places. These imports are brought in by carriers and distributed by them to the several places of destination.

It is unnecessary to cite authorities to the proposition that it is the common law duty of the carrier to receive, carry and deliver goods; that by virtue of this obligation it is entitled to retain possession until its charges are paid. Nor is this lien confined to the charges for its own transportation. The law is thus stated in Overton on Liens, sec. 135, p. 166:

"The lien attaches not alone for the particular item of charge for carriage due upon the goods, but for such other legal charges as the carrier, in the course of his duty, may have been compelled to expend upon their care, custody and preservation. As when a railway, in the transportation of live stock, as cattle, horses and swine, has been at expense of labor and money in feeding and preserving them, such expense is a legitimate charge in addition to their transportation. For the carrier is under special obligation to guard and protect such property, hence the propriety of a lien for such extraordinary expense and care. If a carrier, in the ordinary course of the business, pay back charges upon goods due to another carrier in the course of transportation, as they come to him, he may recover for such back charges and freight so paid; and the owner may seek his remedy for any damages done them against the party in whose hands it was done, or under his original contract of shipment."

See also Hutchinson on Carriers, sec. 478a; Ray on Freight Carriers, sec. 102. In Schouler on Bailments, p. 544, it is said:

"A common carrier, then, may usually retain particular goods, by virtue of his lien right, until the freight and charges due thereon for his whole transportation are paid or tendered him, and he cannot be compelled to give them up sooner. This lien, moreover, extends to all the proper freight and storage charges upon the goods throughout the whole of a continuous transit over successive lines; since the last carrier or final warehouseman may advance what was lawfully due his predecessors, and hold the property as security for his reimbursement."

In making payment to a connecting carrier of its freight

charges the carrier is not a mere volunteer, such as is referred to in *Ætna Life Insurance Company* v. *Middleport,* 124 U. S. 534.

All this was matter of common knowledge, and upon this the legislation in respect to duties was enacted. Is it to be supposed that Congress intended that protection to the carrier should depend upon the perhaps varying opinions of the courts of the different States as to whether in making payment the carrier was a mere volunteer, or whether it can be subrogated to the rights and remedies of the nation? It must be remembered that the importation of goods is a subject of national and not of state regulation, that such power of regulation continues until the final delivery of the imported articles, so that over the entire transportation of these goods to St. Louis, the place of delivery, the power of Congress was supreme and exclusive. It must also be remembered that bonded goods are, by section 2993, Rev. Stat., deliverable only to carriers designated by the Secretary of the Treasury, which are made responsible to the United States, and are required to give bond to the United States in such form and amount and with such conditions and security as the Secretary of the Treasury shall require. Is it not reasonable to hold that Congress—having in mind the duty of carriers in reference to transportation and delivery, their customary lien for charges, and their right to retain possession during transit—in directing the custom house officers to take goods out of a carrier's possession, inspect and hold until the duties are paid, intended that upon payment the Government lien should pass to the carrier with a view of enabling it to discharge its duty of carriage and delivery to the consignee? It was not necessary to specifically state that the Government's lien was transferred, for when Congress provided by statute for interrupting the carrier's common law right of possession, it is implied that the action necessarily taken by the carrier to regain possession shall work no injury to the rights which flow from possession. Such, it seems to us, is the fair import of this legislation, enacted, as it was, in view of the

well recognized rights and duties of carriers. The defendant should not, therefore, have been deprived of the possession of the goods without a repayment of the duties.

It is insisted, however, that the goods were shipped in bond to St. Louis, that the Canadian Pacific for its own convenience wrongfully changed their bonded destination to the port of St. Paul, and that during the examination and inspection at St. Paul some of the curios were broken, and some lost, whereas if they had been shipped in bond to St. Louis they might have been opened and examined in the presence of the plaintiff and injury and loss prevented. Conceding this, and that the Canadian Pacific by its wrongful act was liable for the injuries resulting to the plaintiff, the contract of shipment stipulated that each of the parties employed in the carriage should be liable only for loss or damage accruing upon its own road, and that such carriers should not be jointly liable, nor either for any loss or damage accruing upon the road of the other; so that whatever claim the plaintiff may have had for such injury and loss was only against the Canadian Pacific, and could not operate to prevent the defendant company from receiving that which by its payment it was entitled to.

*The judgment of the St. Louis Court of Appeals is reversed and the case remanded to that court for further proceedings not inconsistent with this opinion.*